UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

ROGER SAPPINGTON, et al.                                                                      PLAINTIFFS

VS.                                                                                  CIVIL NO.1:06CV249-JAD

STYLE-LINE FURNITURE                                                                           DEFENDANT

## MEMORANDUM OPINION

Roger Sappington and David Langford have sued their former employer Style-Line Furniture alleging the company violated the Fair Labor Standards Act when it failed to pay them time and a half for their work in excess of forty hours per week. Style-Line has moved for summary judgment asserting that Sappington and Langford are exempt employees and therefore not entitled to any back wages.

## SUMMARY JUDGMENT STANDARDS

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56(e) Fed.R.Civ.P. requires that materials supporting or opposing the motion be admissible at trial. Material that would be inadmissible cannot be considered on a motion for summary judgment since it would not establish a genuine issue of material fact.

Summary judgment is proper "where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof. A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue

of material fact." *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265(1986))  If the party with the burden of proof cannot produce any summary judgment evidence on an essential element of his claim, summary judgment is required.  *Geiserman v. MacDonald,* 893 F.2d 787, 793(5th Cir. 1990).

The moving party must make an initial showing that there is no dispute of material fact or that there is a failure of proof of an element of the claim.  If this showing is made, the nonmoving party must go beyond pleadings and submit specific evidence showing that there are one or more genuine issues of fact to be resolved by trial. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (emphasis omitted).  While all facts are considered in favor of the nonmoving party, including all reasonable inferences therefrom,  *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995), the nonmovant's burden, " is not satisfied with 'some metaphysical doubt as to the material facts,'" *Matsushita,* 475 U.S. at 586, 106 S. Ct. at 1356, by 'conclusory allegations,' *Lujan,* 497 U.S. at 871-73, 110 S.Ct. at 3180, by "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir.1994). *Little v. Liquid Air Corp.* at 1075.[1]  "A dispute regarding a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v.*

---

[1] Quoting from *Matsushita Electric Indus.Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538(1986) and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111L.Ed.2d 695(1990).

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d. 202 (1986). Summary judgment is appropriate if "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."

*Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

Here the burden of proof that an exemption applies is on the employer and the exemptions are narrowly construed against the employer. *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1224 (5th Cir. 1990). The plaintiff's need only show that there is a material dispute of genuine facts to avoid summary judgment. These standards have been applied in evaluating the evidence of record in support of and opposition to the motion for summary judgment.

## ANALYSIS

Style Line's motion for summary judgment asserts that there is no bona fide dispute of material facts and that as a matter of law, the plaintiffs Sappington and Langford are "employed in a bona fide executive capacity" 92 U.S.C. § 213(a) and 29 C.F.R. § 541.100, and therefore not entitled to overtime pay. The plaintiffs oppose the motion arguing that there are factual disputes that must be resolved by the jury. While the parties disagree about the import of the facts, most of the facts surrounding the employment of the plaintiffs are not in dispute and the record before the court is primarily the plaintiffs' depositions. The sole disputes of fact presented by the record are the exact extent of overtime worked by the plaintiffs and the division of their time between exempt work and non-exempt work.

Under 29 C.F.R. § 541.100(a) an employee is employed in a bona fide "executive capacity" if:

> (1) Compensated on a salary basis at a rate of not less than $455 per week;
> (2) Whose primary duty is the management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

In their response to the summary judgment motion, the plaintiffs admit that they meet the criteria of an executive exemption under clauses (1) and (4). They assert that they are not executives under clauses (2) and (3).

The plaintiffs challenge their exempt classification alleging that they spend so much time performing non-exempt tasks that they cannot be considered executives. The plaintiffs do not contest that the lines they supervised were a customarily recognized department or subdivision of Style-Line. They also admit that they performed management functions while acting as supervisors over the line. They contend their primary function was performing non-exempt job functions, largely working on the assembly line themselves. For the same reason they disagree that they "customarily and regularly" direct the work of two or more other employees.

While this regulation lists its test for a bona fide executive in four parts, for the purpose of this analysis, it can just as easily be considered a three part test. In lay terms there are three primary questions: 1) Are you really a boss (including having hiring and firing power)? 29

C.F.R. § 541.100(2) & (4); 2) Are you paid the statutory minimum? 29 C.F.R. § 541.100(1); and 3) Do you supervise at least two full-time employees? 29 C.F.R. § 541.100(3).

SUPERVISION OF TWO OR MORE EMPLOYEES

The court finds that the plaintiffs' attempt to argue the extent of time spent by the plaintiffs in non-exempt versus exempt work is not an appropriate consideration under subsection 3. The cases cited by the plaintiffs do not aid them. In *Murray v. Stuckeys, Inc.*, 50 F.3d 564(8th Cir. 1995) the court's focus was not on the supervisor's time, but on the time worked by the supervised employees. The qualification was met in *Murray* not because of any percentage of the supervisors' time dedicated to supervision. Because 98.2% of the time each of the *Murray* supervisors had at least the equivalent of two full time employees under their direction in any given week, they customarily and regularly supervised or directed the work of two or more employees. Similarly in *Secretary of Labor v. Daylight Dairy*, 779 F.2d 784(1st Cir. 1985) the supervisors did not "customarily and regularly" direct the work of two or more employees because approximately 25% of the time the supervised employees worked less than 80 hours in a given week.

If Sappington's and Langford's primary function is management, it is beyond dispute that they supervised more than two full time employees each week. Each was in charge of an assembly line which on a daily basis would have six to eight full time employees. There are no triable issues of fact with regard to part three of the test.

PRIMARY FUNCTION

Is management the plaintiffs' primary function? Management is defined by the regulation by a list of activities typical of management. The activities are "interviewing,

selecting and training employees;  setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency…; handling employee complaints and grievances; disciplining employees;  planning the work; determining the techniques to be used; apportioning the work among employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to the bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget and monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102.  The record establishes that Sappington and Langford filled many, but not all of these functions.  While they concede that they filled management functions to the extent that their time was spent in supervision, it is important to look at precisely what their jobs entailed to make a determination of whether or not they can be found to be exempt employees as a matter of law.

      Sappington and Langford were both employed as line supervisors with the defendant. Sappington worked for the company for a four month period ending on May 24, 2006.  Langford worked for the company for approximately ten years leaving in mid 2006.  Sappington's gross wages were $ 750.00 per week.  Langford's gross wages were $ 772.50.  Their pay did not fluctuate with the level of production on their lines, nor were there deductions for time off from work.  Each understood they were to be salaried workers and that some overtime work would be involved.  Workers on Sappington's line made an average of $511.36.  Workers on Langford's lines made an average of $579.80.  Each plaintiff received company paid health insurance for

themselves and their families. The individuals they supervised received only 75% of their individual premiums as a benefit and nothing toward family coverage.

Each plaintiff was in charge of running a furniture assembly line. Langford routinely opened the plant for deliveries and in anticipation of the arrival of all workers. Each man supervised approximately 8 employees on different lines. At the beginning of each line a frame for a chair, sofa or other piece of furniture would begin the process, with each employee performing one step in the process, with the end result being a finished piece of furniture, ready for packing. The lines ran on a shift from approximately seven a.m. to 4:30 p.m., with a 45 minute lunch break.

Each morning the plaintiffs would prepare production paperwork for 30 to 45 minutes and give it to the plant manager. They would get their lines moving. They and the other area managers would then meet with Kenneth Buchanan the plant manager to go over the production schedules for the day. The different departments would determine where others stood on the schedules to coordinate production. The coordination of the different departments work was an ongoing concern and potential problem for management. The goal was to have a level of coordination of schedules to keep production from coming to a standstill. This coordination was a tricky process as the assembly lines might work the styles faster than the sewing department could sew parts or the filling department could stuff pillows or other parts. The managers would also discuss employee absences since these impacted production schedules.

These plaintiffs were in charge of assigning the duties to be performed by each employee. Because of absences and turnover, these assembly lines were frequently short handed. Sometimes, but apparently infrequently, floaters were available to fill in. Sometimes

the plaintiffs would get employees to assist in helping with one another's work. Sometimes the supervisors would themselves join in the work of the line to take up the slack. They would urge employees to get busy or work faster as needed. Langford testified that because the varying levels of difficulty of the work at the different stages of assembly, some employees would unavoidably get backed up. He kept after the other employees to help those with more difficult or time-consuming tasks to keep production moving quickly.

There was one employee assigned to keep supplies on hand for the assembly lines. The supplies needed were not just staples, brads and other basic supplies, but also the work product of other areas in the plant which would be assembled on the line. There was more work in keeping the lines supplied at all times than this employee could handle. For that reason the supervisors would from time to time leave the line to obtain supplies to keep the line moving. The line workers never performed this job as they were not permitted to go into other areas of the facility.

Part of the job of supervisors was to monitor the work in progress to make sure the work was performed to standards and correct any mistakes quickly. The goal was to catch the mistake when made and not at the end of the assembly process. Quickly catching mistakes meant correcting one error, not multiple repetitions of the same mistake.

The job also involved training new and old employees on the line. When a new design was developed the supervisors would build samples as a means of developing assembly line procedure for that particular style. They would then train all the workers on the new design. When new workers were placed in the line, training would be handled by floaters who knew all

the functions of the plant, if available. However the training frequently was done by the supervisors. This involved physically helping the new worker do the assigned job.

The supervisors were responsible for meeting the production goals for the day. They tracked the items assembled because the line workers were paid on a piece basis. They turned in this paperwork in to payroll. The plaintiffs did not make the work schedules, but provided them to the workers. They handled some employee complaints and grievances.

The plaintiffs did not make the production schedules but did according to Langford have some discretion in the timing of the work. For instance Langford would change the order of production around to run similar styles together to avoid unnecessary changeovers. The plaintiffs each testified that the job of running their lines was entrusted to them. With the exception of Langford testifying to being told to build rockers so they would be available for his line's use, when the plant was in production, the plaintiffs decided what they needed to do to push production forward. While personnel and resource limitations may have left them frustrated and with limited options, necessarily implicit in the testimony of these men is that they decided when to do the work on the line; when to check on the work of others on the line; when speak to employees; or when to stop to run for supplies. This power to decide what they needed to be doing at any given moment, whether exempt or non-exempt work, is an earmark of an executive. 29 C.F.R § 541.106(a).

The supervisors were responsible for seeing that the work was performed safely. They would correct employees violating rules. They would assure the workers used appropriate safety equipment and did not put their scissors in their back pockets. Making sure that the work area around the lines was cleaned and cleared was also important to employee safety.

As they admitted in conceding ground four, they were involved in making recommendations for the hiring and firing of employees. The job included evaluating employees for promotions or pay increases. These recommendations were given great weight and generally followed by upper management. Recommendations for pay increases, due to overall financial conditions with the company, were the most likely not to be followed. Each conceded that they disciplined employees. Langford issued write-ups and Sappington had his entire line called to the office because of attitude problems.

After the shift workers left, the supervisor did some sweeping and cleaning, not only in the areas where their line workers were primarily responsible for cleaning, but also in the no man's land area. They also did some cleaning in the warehouse. On several occasions the supervisors were required to go through garbage cans looking to see if supplies were being improperly and wastefully disposed of by the line workers. Sappington indicated this did not take much time but was unpleasant.

Sappington in his deposition indicated that he expected to work overtime but not to the extent Style-Line required. He claimed that during his employment he and the other line supervisors routinely worked until 9:00 p.m. at night and on most weekends. Langford indicated that he worked until six or seven most nights. Per Langford, the supervisors would work substantially later to eight and nine o'clock at night in preparation for markets four times per year. For their part the defendants have produced records for their security system which show that during Sappington's four months of employment the plant was closed down on average at 6:00 p.m. The extent of overtime worked is not determinative in this case and this factual dispute, not material to the determination of the plaintiffs' primary function.

It is undisputed that the supervisors worked after production closed for the day. During this 'after hours' time and on Saturdays, they performed a variety of work. They worked on samples for market. They worked with both new and old designs building samples to work out design difficulties for the production line. This type of work is "directly and closely related' to their exempt job functions and is therefore also exempt. 29 C.F.R.§ 541.703. They performed repairs on furniture that was damaged during shipment. They also performed what can only be called janitorial work during this time. This is non-exempt work. However "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." 29 C.F.R. §541.106(a).

The plaintiffs concede that when they were functioning as supervisors they were performing exempt functions. Because they were needed to fill in for absent workers, the plaintiffs claim they spent as little as twenty-five percent of their time fulfilling management functions. The only testimony on the percentage of time spent on management was Langford's. He did not testify regarding the usual amount of time spent in supervising. Langford testified to a six month period when most of his time was spent working on the line putting in springs. Upper management was making efforts but having difficulty in filling this position. During this time Langford said he spent less than twenty-five percent of his time in management functions.

The record simply does not establish beyond dispute what percentage of their time the plaintiffs spent performing managerial work. If the record established that Sappington and Langford spent at least fifty percent of their time working as managers, they would be generally considered exempt. 29 C.F.R § 541.700(b). But Sappington and Langford may still be exempt

employees even if they spent substantially less than fifty percent of their time performing exempt work.

An employee's primary function is however not determined by computing the time spent on exempt tasks versus the time spent in performing non-exempt work. Assuming that the plaintiffs have spent less than one quarter of their time on exempt work as they contend, the court must still "look at other factors such as the relative importance of the managerial duties as compared to other duties; the frequency with which the employee exercises discretionary powers; the employee's relative freedom from supervision; and comparative wages." *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 862, 866, 43 Lab.Cas. P.34, 243 (N.D.Tex. 2001), *citing Dalheim v.KDFW-TVI,* 918 F.2d 1220, 29 C.F.R. § 541.103; See; *Mims v. Starbucks* 2007 WL 10369(S.D.Tex. 2007).

The court must look to whether these men "were ultimately responsible for the success or failure" of their lines, *Moore v. Tractor Supply Co,.* 352 F. Supp. 2d 1268, 1275(S. D. Fla. 2004), and look at the importance of the managerial work to the overall success of the facility. *Jones v. Virginia Oil Company, Inc.* 69 Fed.Appx. 633(4th Cir. 2003) (unpublished opinion). This first factor is established by the plaintiffs' testimony. The plaintiffs were in charge of their lines. They did not share responsibility for supervision of the lines with other managers. They oversaw quality and timeliness of production. Upper management looked to them to get the results; that is to have their lines produce all of the product on their schedules each day. They were not merely 'in charge' of their lines, in the absence of upper management, but hour by hour and day by day according to their own testimony.

Secondly, these supervisors frequently exercised discretion as a part of their jobs. Langford's testimony establishes that the line supervisors were given some discretion in the planning of the work and would perform assembly out of order from the production schedule. This is not the only discretion exercised by the plaintiffs. They made decisions on the assignment of work on the line. They decided when to require one worker to help another. They decided when they needed to get additional supplies and when they needed to perform work on the line, either in training or to compensate for missing workers. They decided whether to act on employee complaints, take them to higher level management or to ignore them. They made decisions on when to write up employees. They juggled sometimes limited personnel and late arriving supplies in order to maintain the flow of production. In working on samples to tweak designs and iron out flaws they used their expertise and discretion. In all these functions they were not only using discretion but valuable problem solving management skills.

Langford's testimony establishes that the plaintiffs ran their lines with little or no direct oversight from the plant manager meeting the third of the list of factors to be considered in determining their primary duty.

Finally the court must look at the relative relationship between the wages of these employees and those paid to non-exempt employees. Sappington's salary was approximately 50% higher than the average of the workers on his line. Langford's salary was one-third higher than those of his more experienced, better paid line. Additionally as noted above the supervisors were provided with fully paid medical coverage for themselves and their families. The non-exempt employees paid 25% of their own health insurance cost and 100% of any premiums for family coverage. This is a marked disparity in pay which is a "hallmark of exempt status."

*Mims v. Starbucks* at *8.   The court agrees with Style-Line that these men were paid for their skills in management and not for the value of any non-exempt tasks they performed concurrently.

The court finds that on the record before it that the exact division of time spent between exempt and non-exempt work cannot be ascertained as a matter of law.  However, even if a jury were to find in the plaintiffs' favor and accept that they spent less than twenty-five percent of their time on exempt work, this fact standing alone will not support a verdict in their favor. Given all the other undisputed evidence in the case, the plaintiffs meet all criteria for being classified as bona fide executives as a matter of law.  This holding moots the remaining controversies between the parties.  The defendant is entitled to summary judgment dismissing this action with prejudice.  A separate order will follow.

This the 8th  day of November, 2007.

/s/ JERRY A. DAVIS  
UNITED STATES MAGISTRATE JUDGE